# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WARREN T. FLETCHER,             *

Plaintiff,                     *

v.                             *         Civil Action No. PWG-18-3319

DAYENA M. CORCORAN,        *
SHARON BAUCOM,
FRANK B. BISHOP,            *
LT. VAUGHN WHITEMAN,
SGT. SCOTT BEEMAN,         *
OFFICER RONALD SAVILLE,
JOHN GARY SINDY,           *
L. TENILLE WINTERS,
RALIN PIERCE,               *
WEXFORD HEALTH SOURCES, INC.,
SGT. APRIL CARR,            *
OFFICER AMY CONNER,
HOLLY PIERCE,              *
JEFF NINES,
DAVID SIPES,               *
SGT. CHRISTOPHER WEDLOCK,

                               *

Defendants.[1]

\*\*\*

## MEMORANDUM OPINION

Plaintiff Warren T. Fletcher, who is representing himself in this suit, brings this civil action pursuant to 42 U.S.C. § 1983 against former Commissioner of Correction Dayena M. Corcoran; Sharon Baucom, M.D., Medical Director for the Department of Public Safety and Correctional Services ("DPSCS"); Frank B. Bishop, Warden at the North Branch Correctional Institution ("NBCI"); NBCI Assistant Warden Jeff Nines; Correctional Case Management Supervisor L. Tenille Winters; Correctional Case Management Specialist II John Gary Sindy; Mental Health

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants Whiteman, Beeman, Saville, Sindy, Winters, R. Pierce, Carr, Conner, Wedlock, and Wexford.
.

Professional Counselor Ralin Pierce ("R. Pierce"); Lt. Vaughn Whiteman; Sgt. April Carr; Sgt. Christopher Wedlock; Correctional Officer II Scott Beeman; Correctional Officer II Amy Conner; and Correctional Officer II Ronald Saville (collectively, the "Correctional Defendants"); Wexford Health Sources, Inc. ("Wexford") and Holly Pierce, NP (collectively, the "Medical Defendants"); and Adjustment Hearing Officer David Sipes. Compl., ECF No. 1; Am. Compl., ECF No. 18. Fletcher asserts a violation of his constitutional rights arising from the Defendants' refusal to move him to a different cell, failure to properly process his requests for Administrative Remedy Procedure ("ARP"), denial of medical treatment and access to the prison law library, unprofessional conduct, gross negligence, retaliation, and failure to protect him from other inmates. ECF No. 18. Fletcher seeks declaratory relief and monetary damages. ECF No. 1 at 10.

On July 24, 2019, the Medical Defendants filed a Motion to Dismiss or Alternatively, for Summary Judgment. ECF No. 40.[2] On August 21, 2019, Fletcher filed a Motion to Enter Default Judgment asserting that more than 60 days had elapsed since the Court directed Defendants to respond to the complaint as amended and no response had been filed. ECF No. 47. On September 18, 2019, the Correctional Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 50. Fletcher was informed by the Court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the Defendants' Motions could result in dismissal of the Complaint. ECF No. 42, 51. Fletcher did not respond.[3] A hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons

---

[2] By correspondence dated August 19, 2019, Fletcher claimed that he had not received a copy of Wexford's Motion. ECF No. 45. On August 23, 2019, counsel for Wexford indicated that an additional copy of the Motion was sent to Fletcher. ECF No. 48.

[3] On November 7, 2019, the Court received an envelope from Fletcher; however, it contained only 14 blank sheets of lined paper. ECF No. 52.

stated herein, Fletcher's Motion to Enter Default Judgment shall be denied, and the Defendants' Motions, construed as Motions for Summary Judgment,[4] will be granted.

## Background

### A.    Complaint Allegations

In his original Complaint filed on October 26, 2018, Fletcher claimed that he was arbitrarily transferred from Western Correctional Institution to NBCI, where he was subjected to excessive force in the form of sexual and physical assault and deprived of adequate medical treatment. Compl. at 9, ECF No. 1.[5]  Fletcher also alleged that Defendants prevented him from filing ARPs by deliberately destroying his requests.  *Id.*  Without providing additional details, Fletcher claimed that COII Conner subjected him to cruel and unusual punishment, COII Saville failed to submit his ARP to the proper person, Winters failed to properly conduct his revocation hearing, R. Pierce made derogatory remarks and placed him in administrative segregation, NP Pierce retaliated against him by depriving him of medical treatment after he filed ARPs against her and "her daughter R. Pierce," and Wexford failed to provide a qualified medical doctor at NBCI.  *Id.* at 5-6.

Thereafter, Fletcher submitted a Motion for Leave to File a Supplemental Complaint, ECF No. 18, and a Motion to Amend Original Complaint, ECF No. 25, both of which sought to name additional Defendants and add generic claims.  I denied his motions without prejudice and granted him 28 days in which to file a revised motion that alleged facts supporting his claims.  ECF No.

---

[4] Because Defendants filed Motions titled "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," along with documents in support, and Fletcher also submitted several exhibits to support his contentions, Fletcher was on notice that the Court could treat the Defendants' Motions as ones for summary judgment and rule on that basis.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998).

[5] All references to exhibits reflect their electronic pagination.

26.  On May 24, 2019, Fletcher filed a Motion to Amend Original Complaint, accompanied by an affidavit and supporting exhibits, ECF No. 31, which I granted in part and denied in part, ECF No. 34.  Specifically, I construed the motion, affidavit, and exhibits, along with the original Complaint, to be the proposed operative complaint, brought against the Defendants listed herein.  ECF No. 34.

In the amended complaint, Fletcher alleges that on August 20, 2018, he informed R. Pierce that he had to be removed from the cell he shared with an inmate named Daniel Collins, but R. Pierce, COII Conner, COII Saville, and Lt. Whiteman conspired to keep him in the cell in an attempt to have the inmates try to kill each other.  Am. Compl. at 1, ECF No. 31-1; Letter to R. Pierce, ECF No. 31-2 at 1.  On August 21, 2018, Fletcher began a hunger strike in an attempt to be transferred to a different cell, but Sgt. Carr did not note it in the log book.  ECF No. 31-1 at 1; Letter to Sgt. Carr, ECF No. 31-2 at 2.

On August 23, 2018, Fletcher filed ARPs against R. Pierce and Sgt. Carr, and COII Conner threatened to place him in segregation if he did not withdraw the ARPs.  ECF No. 31-1 at 2. Fletcher claims that after he refused to withdraw the ARPs, COII Conner fabricated a notice of infraction recommending an assignment to administrative segregation.  *Id.*; Notice of Infraction, ECF No. 31-2 at 3.  However, the adjustment team dismissed the notice of infraction as the video did not substantiate COII Conner's allegations.  ECF No. 31-1 at 2; Inmate Hearing Record, ECF No. 31-2 at 4-5.  Fletcher was directed to return to the cell he shared with Collins.  ECF No. 31-1 at 2.

On August 30, 2018, Fletcher wrote a letter to Warden Bishop requesting that criminal charges be filed against COII Conner but received no response.  *Id.* at 3; Letter to Warden Bishop, ECF No. 31-2 at 6.  That same day, he filed ARP No. NBCI-1449-18 against Sgt. Carr for deliberately destroying the ARPs he attempted to file on August 23, 2018.  ECF No. 31-1 at 3;

ARP, ECF No. 31-2 at 8-9. According to Fletcher, Assistant Warden Nines did not address ARP No. NBCI-1449-18 until five months later because he could not justify Sgt. Carr's actions. *Id.*

On September 4, 2018, Fletcher attempted to resubmit his ARP against COII Conner. ECF No. 31-1 at 4; ARP, ECF No. 31-2 at 10-12, 13-14. The following day, he notified Major Douglas E. Cloman, Director of the Internal Investigation Unit, about the ARP and requested an investigation and criminal prosecution of COII Conner. ECF No. 31-1 at 5; Letter to Cloman, ECF No. 31-2 at 15. On September 6, 2018, Fletcher sent the same request to Stephen T. Moyer, DPSCS Secretary. ECF No. 31-1 at 5; Letter to Moyer, ECF No. 31-2 at 16.

On September 12, 2018, Fletcher informed Warden Bishop that NBCI staff refused to accept his ARPs. ECF No. 31-1 at 6; Letter to Bishop, ECF No. 31-2 at 23. On September 19, 2018, Fletcher sent correspondence to the Inmate Grievance Office ("IGO") regarding his claims against COII Connor but received no response. ECF No. 31-1 at 6; Letter to IGO, ECF No. 31-2 at 24-28. That same day, Fletcher sent correspondence to R. Pierce informing her that he heard her make a derogatory remark about him while speaking to COII Saville. ECF No. 31-1 at 6; Letter to R. Pierce, ECF No. 31-2 at 29. On September 22, 2018, Fletcher filed ARP No. NBCI-1561-18 against NP Pierce claiming that she "deliberately denied Plaintiff medical treatment out of retaliation because of her daughter Defendant Ralin Pierce." ECF No. 31-1 at 6; ARP, ECF No. 31-2 at 30-31.

On October 16, 2018, Fletcher sent correspondence to Roderick claiming that Defendant Sindy encouraged Lt. Whiteman to call Fletcher a "crying bitch" after Lt. Whiteman refused to process Fletcher's ARP against Defendant Winters. ECF No. 31-1 at 7; Letter to Roderick, ECF No. 31-2 at 33. On October 17, 2018, Fletcher also sent correspondence to Sindy accusing him of "unprofessional conduct/gross negligence." ECF No. 31-1 at 7; Letter to Sindy, ECF No. 31-2 at

34.  On October 26, 2018, Fletcher submitted ARP No. NBCI-1801-18 to COII Beeman claiming that Lt. Whiteman refused to process his ARP against Winters.  ECF No. 31-1 at 7; ARP, ECF No. 31-2 at 35-36.

On November 5, 2018, Fletcher notified Roderick that NBCI staff wanted him to kill his cellmate, Collins.  ECF No. 31-1 at 9; Letter to Roderick, ECF No. 31-3 at 7.  On November 7, 2018, Collins was removed from the cell he shared with Fletcher after Roderick discovered that he was Fletcher's known enemy.  ECF No. 31-1 at 9.  On November 9, 2018, NBCI staff housed a gang member in Fletcher's cell.  *Id.* at 9-10.  Also on November 9, 2018, Fletcher attempted to file an ARP against Sindy accusing him of allowing NBCI staff to steal Fletcher's legal documents.  *Id.* at 8; ARP, ECF No. 31-2 at 40-43.  That same day, Fletcher informed COII Beeman that he did not receive the required receipts for two ARPs that he submitted.  *Id.*

On November 14, 2018, Lt. Whiteman fabricated a notice of infraction alleging that Fletcher disrespected Sgt. Carr.  *Id.* at 11.  According to Fletcher, Lt. Whiteman wrote the infraction because Fletcher refused to withdraw the ARP he filed against COII Saville.  *Id.*  On November 20, 2018, Fletcher submitted ARP No. NBCI-1934-18, claiming that NBCI staff deliberately ordered him to move into a cell with his known enemy, Collins.  *Id.*; ARP, ECF No. 31-3 at 10-11.  On November 27, 2018, Fletcher informed Warden Bishop of the same, and on December 27, 2018, he also informed Nines.  ECF No. 31-1; Letter to Bishop, ECF No. 31-3 at 12; Letter to Nines, ECF No. 31-3 at 16.

On November 29, 2018, Fletcher complained that COII Conner denied him access to the prison law library.  ECF No. 31-1 at 8; Informal Complaint Form, ECF No. 31-2 at 44.  Fletcher also claims that Defendants Sipes and Wedlock conspired to alter the chain of custody for the evidence presented in his adjustment hearing.  ECF No. 31-1 at 8-9.  Subsequently, Fletcher filed

ARP No. NBCI-1986-18 against then-Acting Warden Richard Roderick for failure to investigate Fletcher's claim that his mail was being stolen. *Id.* at 5-6; ARP, ECF No. 31-2 at 21-22. On November 30, 2018, Fletcher filed ARP No. NBCI-1989-18 against Lt. Whiteman for preventing approximately 10 ARPs from being processed. ECF No. 31-1 at 9; ARP, ECF No. 31-3 at 5-6, 17-19.

On December 6, 2018, Fletcher informed Nines that NBCI staff deliberately placed his life in danger. ECF No. 31-1 at 10; Letter to Nines, ECF No. 31-3 at 13. On December 10, 2018, Fletcher was placed on administrative segregation after Collins claimed that Fletcher raped him and ordered another inmate to stab him. ECF No. 31-1 at 10; Notice of Assignment, ECF No. 31-3 at 14. On December 11, 2018, Fletcher was reassigned to punitive segregation after a correctional officer placed a weapon under his bed. ECF No. 31-1 at 10; Notice of Inmate Rule Violation, ECF No. 31-3 at 15.

## B. Medical Defendants

Fletcher claims that the Medical Defendants denied him medical treatment, NP Pierce retaliated against him after he filed ARPs against her, and Wexford failed to provide a qualified medical doctor at NBCI. Prior to the filing of his Complaint, from June 2018 through October 2018, Fletcher filed several sick calls, which are summarized as follows.

On June 27, 2018, Fletcher filed a sick call request stating that he felt sick and dizzy, and his veins were swollen after being forced to eat. Medical Records at 2, ECF No. 40-2. The next day, on June 28, 2018, Fletcher filed another sick call request stating that he had suffered a spider bite three days earlier that had not yet healed. *Id.* at 3. On June 30, 2018, Fletcher was seen by Stacie Mast, RN regarding his complaint of feeling sick and dizzy. *Id.* at 2. Mast explained to Fletcher that his bulging veins were not medically related to his diet or sugar levels. *Id.* at 24. She

also noted that Fletcher offered no explanation for his need of a 2,400-calorie diet, but she referred him for an evaluation of his diet request anyway. *Id.* The record lists NP Pierce as the provider for Fletcher's visit that day. *Id.* at 25.

On July 3, 2018, Fletcher was scheduled for a follow up regarding his spider bite but failed to show up for a physical exam. *Id.* at 26. The record generated by Michael Klepitch, RN indicated that Fletcher instead went to the NCBI prison yard. *Id.* Again, NP Pierce was listed as the care provider on duty. *Id.*

Fletcher filed his next sick call request on July 15, 2018, claiming that he was being denied adequate medical treatment for his medical diet, spider bite, and rashes on both arms. *Id.* at 4. Fletcher was scheduled to be seen by Klepitch and NP Pierce the following day, but Fletcher again failed to come to the medical unit for his scheduled appointment and told a correctional officer that "he would [choose the] yard rather than sick call." *Id.* at 28. Klepitch advised Fletcher that he should file another sick call request if the "signs and symptoms of infection develop, or symptoms do not subside." *Id.* at 29.

On July 20, 2018, Fletcher filed another sick call request regarding his request for a medical diet of 2,400 calories. *Id.* at 5. On August 10, 2018, NP Pierce signed a form titled "Medical Diet Referral Form" indicating the renewal of Fletcher's "2400 calories diabetic" diet as well as the fact that Fletcher is not insulin dependent. *Id.* at 66.

On August 13, 2018, Fletcher submitted a request to review his medical records. *Id.* at 6. On August 16, 2018, NP Pierce submitted a form indicating that Fletcher refused to have a physical examination. *Id.* at 73.

On August 26, 2018, Fletcher filed two sick call requests alleging that his "left arm and hand has remained numb for approximately (3) months from being denied adequate medical

treatment," *id.* at 7, and he was "[b]eing denied high blood pressure medication," *id.* at 8. In the form for the latter request, medical staff noted that his "meds [were] good until Nov Dec." *Id.* On September 3, 2018, Regina Lease, RN saw Fletcher regarding his complaints. *Id.* at 31-32. During that visit, Fletcher stated that "[t]he medicine they have me on now just makes me sick, it does not help this pain and numbness." *Id.* Following a physical examination, Lease noted that Fletcher's vitals were unremarkable and that there were no causes for alarm. *Id.* She also noted that Fletcher was receiving daily doses of Vasotec, a high blood pressure medication, for which his prescription was valid through December 16, 2018. *Id.* Lease placed a provider referral to evaluate Fletcher's complaints about his pain and advised him to "make sure he comes for future medical calls." *Id.* Fletcher left the medical department without voicing any other concerns. *Id.*

On September 13, 2018, Fletcher submitted a sick call request to have his medication refilled. *Id.* at 9. The medical department provided a refill of Fletcher's "Tar Shampoo 255 ml" on September 14, 2018. *Id.* That same day, Fletcher tested negative for tuberculosis. *Id.* at 65.

On October 1, 2018, Fletcher submitted a sick call request stating that he would begin a "hunger strike until this medical staff provide said adequate medical treatment chronic care, renewal of medications and treatment." *Id.* at 10. On October 15, 2018, he submitted a sick call slip requesting to see a doctor for numbness in his left arm and hand and for chronic care. *Id.* at 11-12. Fletcher was seen by the medical department on October 16, 2018 regarding his complaint that his "pain meds aren't working and [he] need[s] shampoo for [his] skin." *Id.* at 32-33. At that time, Klepitch noted that Dr. Getachew had already prescribed Coal Tar 1% for his skin as indicated in the September 13, 2018 medication refill request, and that Fletcher would be referred to a provider for reevaluation of his medication for nerve pain on October 19, 2018. *Id.*

On October 17, 2018 the medical department again saw Fletcher regarding his left extremity pain and high blood pressure. *Id.* at 34-36. Noting Fletcher's history of hypertension, Katrina Opel, NP noted that he is taking Vasotec and that his hypertension is "controlled." *Id.* Opel advised Fletcher to continue his medication, maintain a healthy, low-sodium diet, and remain physically active. *Id.* Opel also noted that the charcoal shampoo had been ordered for Fletcher's skin condition and that, with regard to the "shooting [pain] in his left hand," the hand was unremarkable in appearance. *Id.* Nonetheless, Opel increased Fletcher's Elavil dosage to 75mg to help cope with the pain. *Id.* She also referred him for lab work to ensure that he is otherwise healthy. *Id.* On December 6, 2018, Fletcher refused to have his blood drawn. *Id.* at 77-78.

## C.    Correctional Defendants

Plaintiff was transferred from Western Correctional Institution ("WCI") in Cumberland, Maryland to NBCI on May 30, 2018. Traffic History at 3, ECF 50-30.

Sgt. Beeman, an ARP Coordinator at NBCI, states that from the time Fletcher was housed in WCI in 2008, he has filed 344 ARPs, 15 of which were filed at NBCI beginning in June 2018. Declaration of Sgt. Scott Beeman at ¶ 3, ECF No. 9-3. Sgt. Beeman states that all of the ARPs Fletcher submitted to the ARP office at NBCI have been thoroughly investigated and handled in accordance with OPS.185.0002 and COMAR 12.02.28. *Id.* at ¶¶ 5, 7.

John White, a Correctional Case Management Specialist II assigned as the Inmate Grievance Coordinator at NBCI, states that Fletcher was previously assigned to his caseload and had been a difficult inmate to manage. Decl. of White at ¶ 5, ECF No. 9-7. According to White, Fletcher frequently made claims of having enemies. *Id.* When Fletcher claimed that he should be placed on protective custody status, White reviewed Fletcher's base file, which at that time consisted of seven volumes, and was unable to locate any documentation to support Fletcher's

request.  Second Decl. of White at ¶ 3, ECF No. 50-3.  In a letter dated June 19, 2018, White informed Fletcher that upon reviewing his files, White found no documented enemies of Fletcher at NBCI.  Letter, ECF No. 9-8.

White states that Fletcher also has a history of alleging that NBCI staff fail to properly process his ARPs.  ECF No 50-3 at ¶ 9.  Since November 5, 2018, Fletcher has been filing his ARPs improperly by sending them through the institutional mail instead of giving them to custody staff that collects the ARPs from inmates in their respective housing units.  *Id.* at ¶ 10.  On the top of the ARP forms, Fletcher frequently writes that staff refused to sign the ARP; however, he makes no attempt to submit his ARPs by giving them to the Housing Unit ("HU") Sergeant or other custody staff.  *Id.*  In inmate correspondence dated September 20, 2018, Lt. Whiteman noted that "Inmate Fletcher needs to follow the proper protocol."  Inmate Corr., ECF No. 50-8.

Sgt. Carr states that on August 23, 2018, she and COII Conner spoke with Fletcher in HU 2 regarding an ARP he wanted to file about his cellmate.  Decl. of Carr at ¶ 8, ECF No. 50-23.  According to Sgt. Carr, Fletcher decided not to submit the ARP and returned to his tier.  *Id.*  When he arrived on his tier, he began yelling profanities and attempted to incite other inmates.  *Id.*  Sgt. Carr gave him a direct order to return to his cell and lock in; however, he refused to comply and continued to yell.  *Id.*  She then placed Fletcher in handcuffs, and COII Conner wrote an infraction against him.  *Id.*

Sgt. Carr states that she did not conspire with Assistant Warden Nines to tamper, or interfere, with the processing of any of Fletcher's ARPs.  *Id.* at ¶ 5.  On September 6, 2018, NBCI's ARP Office received four complaints from Fletcher, which were assigned case numbers NBCI-1444-18, NBCI-1445-18, NBCI-1446-18, and NBCI-1449-18.  *Id.* at ¶ 6.  Sgt. Carr states that each ARP was collected by the tier officer on September 5, 2018, in accordance with the ARP collection

procedure. *Id.* In ARP No. NBCI-1444-18, Fletcher claims that numerous ARPs are missing; however, those ARPs contain the same issues raised in ARP Nos. NBCI-1444-18, NBCI-1445-18, NBCI-1446-18, and NBCI-1449-18. *Id.* at ¶ 7; ECF No. 50-24, 50-25. Therefore, Fletcher subsequently withdrew ARP No. NBCI-1444-18. ECF No. 50-25 at 1-3. On September 6, 2018, ARP No. NBCI-1445-18, in which Fletcher alleged that he received a false infraction on August 23, 2018, was dismissed for procedural reasons. *Id.* at 4-5. That same day, ARP No. NBCI-1446-18, in which Fletcher claimed to have submitted four ARPs that were not addressed was dismissed due to Fletcher's failure to resubmit the request by the due date given. *Id.* at 6-9.

Lt. Whiteman, Manager of HU #2 at NBCI, states that he was assigned to investigate Fletcher's allegations against Sgt. Carr in ARP No. NBCI-1449-18. Second Decl. of Whiteman ¶4, ECF No. 50-26. At the time he received it, Lt. Whiteman was assigned to investigate 17 ARPs between August 1 and September 30, 2018. *Id.* Of those 17 ARPs, 16 were investigated within the applicable time frames. *Id.* at ¶¶ 4-5. Lt. Whiteman states he did not respond to ARP No. NBCI-1449-18 in a timely manner because he inadvertently and unintentionally misplaced Fletcher's ARP. *Id.* at ¶4. Lt. William Gillum resumed the investigation of that ARP on February 7, 2019, *id.*, and five days later, it was dismissed due to Fletcher's failure to provide evidence that Sgt. Carr was not properly processing his ARPs. ECF No. 50-25 at 10-16.

Assistant Warden Nines states that he did not conspire with Sgt. Carr or any other staff to tamper with or interfere with the processing of any of Fletcher's ARPs. Decl. of Nines at ¶ 4, ECF No. 50-27. Nines states that when ARP No. NBCI-1449-18 was forwarded to him by Lt. Gillum, Nines did not notice the dates on the ARP itself and only reviewed the ARP Case Summary, and drafted his response on February 12, 2018. *Id.* at ¶ 8. Nines disputes Fletcher's allegation that he delayed his response because he could not justify Sgt. Carr's actions. *Id.* According to Nines,

institutional security video is recorded on DVRs that are connected to various security cameras throughout the institution, and archiving of existing video is done in conjunction with a Use of Force, Serious Incident Report, or other video requested by staff. *Id.* at ¶ 5. The DVRs have a limited capacity, and the length of time video remains on the DVR is determined by the amount of activity captured by the camera. *Id.* Unless a request is submitted for video to be archived, the DVR will return to the beginning of the DVR and record over existing video. *Id.* This cycle repeats every10 to 30 days, depending on the location of the camera and the amount of activity recorded on the camera in that area. *Id.* Nines states that no video exists for the date of August 23, 2018 because no requests were received from staff to archive any video for that date, and there were no incidents involving a Use of Force or Serious Incident Report to warrant archiving the video. *Id.* at ¶ 6. He further states that although ARP No. NBCI-1449-18 was not investigated in a timely manner, the original ARP written by Fletcher on August 30, 2018 shows that the ARP was collected by another officer, not Sgt. Carr, and it was not thrown away or destroyed. *Id.* at ¶ 9. Rather, the ARP was received and subsequently investigated. *Id.*

Nines also notes that Fletcher could have submitted an ARP appeal to the Division of Correction ("DOC") Headquarters when he did not receive a timely response to his ARP. *Id.* at ¶10. According to Nines, filing an appeal would have expedited the matter because the ARP Office at DOC would have contacted NBCI's ARP Office about the delay. *Id.* Lastly, Nines denies tampering with Fletcher's mail or conspiring with any staff to tamper with his mail. *Id.* at ¶4.

With regard to Fletcher's allegation regarding unprofessional conduct by NBCI staff, Lt. Whiteman states that Fletcher first claimed that he was in fear for his safety, as a result of his interactions with COII Saville, on November 14, 2018. Decl. of Whiteman at ¶ 6, ECF No. 9-5. That same day, NBCI's ARP Office received ARP No. NBCI-1849-18, wherein Fletcher alleged,

among other things, that COII Saville disrespected him by using derogatory remarks.  ARP, ECF No. 9-6.  In the space reserved for the signature of the H.U. Sergeant collecting ARPs in Fletcher's housing unit, Fletcher wrote "Refuse to Sign."  *Id.*  A note by Sgt. Beeman dated November 14, 2018, indicates that Fletcher sent his ARP through the institutional mail instead of submitting it to the HU Sergeant.  *Id.*

Sgt. Carr was present when Lt. Whiteman interviewed Fletcher regarding his claims against COII Saville.  ECF No. 9-5 at ¶ 5.  During the interview, Fletcher looked at Sgt. Carr and stated, "You are a racist bitch!"  *Id.*  Lt. Whiteman advised Fletcher not to disrespect the Sergeant in that manner, and Fletcher then looked at Lt. Whiteman and stated, "You are a racist bitch too."  *Id.*  As a result, Lt. Whiteman wrote a Notice of Infraction against Fletcher for violating inmate rule #308 (stealing state property, possession of stolen state property, possession of state property without permission, or tampering with, damaging, or destroying state property), and rule #410 (demonstration, disrespect, insolence, or use of vulgar language, and disobeying a cited facility Category IV rule not listed in the regulation as a rule violation).  *Id.* at ¶ 7.

Defendant Sindy, a Correctional Case Management Specialist II, states that Fletcher is currently assigned to his caseload.  Decl. of Sindy at ¶ 3, ECF No. 9-9.  Sindy states that Fletcher has never expressed concerns about his safety, nor has he provided any information to indicate that he has documented enemies at NBCI.  *Id.* at ¶ 8.  At the time Correctional Defendants filed their dispositive motion, Fletcher had four documented enemies, only one of whom is housed at NBCI. Enemy List, ECF No. 50-6.  That inmate is Daniel Collins, who was added on December 12, 2018, after Collins filed a Prison Rape Elimination Act ("PREA") complaint alleging that Fletcher sexually assaulted him.  ECF No. 50-3 at ¶¶ 5, 6.  On December 10, 2018, Fletcher was placed on five days of administrative segregation pending an investigation into Collins's claim.  *Id.* at ¶6;

14

Notice of Assignment, ECF No. 50-5. The cell that housed Fletcher and Collins was secured as a crime scene for one day. ECF No. 50-3 at ¶ 6. On December 11, 2018, Correctional Officer Bean packed up Fletcher's property, searched the cell on December 11, 2018, and found a homemade weapon. *Id.* Both Fletcher and Collins were issued infractions for the weapon. *Id.* On December 18, 2018, Fletcher's adjustment hearing was held, and he was found not guilty based on his adjustment history lacking weapons charges in contrast to Collins who had an extensive history of weapons violations. *Id.*

Fletcher has also received in excess of 100 infractions resulting in institutional disciplinary adjustment cases since 1984. *Id.* at ¶ 13; Rule Violation Summary, ECF No. 50-10. On October 27, 2018, he received an infraction for violation of inmate disciplinary rule #112 (use of a controlled dangerous substance, use of a medication requiring staff observation to ingest when not prescribed, or use of an intoxicant). ECF No. 50-3 at ¶ 13. On November 8, 2018, Adjustment Hearing Officer David Sipes conducted an adjustment hearing and found Fletcher guilty of the rule violation, resulting in a loss of 30 Good Conduct Credits ("GCCs"), 30 days of cell restriction, and 60 days loss of commissary privileges. *Id.*

Sgt. Wedlock is assigned to NBCI's Adjustment Hearing Office to represent the institution at inmate adjustment hearings. Decl. of Wedlock at ¶ 3, ECF No. 50-17. Sgt. Wedlock states that contrary to Fletcher's allegations, he did not conspire with Sipes, nor did he alter the chain of custody or forge the lab technician's name on the chain of custody pertaining to Fletcher's infraction. *Id.* at ¶ 6. Sgt. Wedlock notes that the Request for Urinalysis Test shows that COII Gordon Ullery collected Fletcher's urine specimen on October 17, 2018. *Id.* at ¶ 7; Requisition Form, ECF No. 50-21.

F. Todd Taylor, Jr., Director of the IGO, states that Fletcher has not filed any grievances with the IGO regarding any of his allegations.  Decl. of Taylor, ECF No. 50-14.

On August 6, 2019, Fletcher was transferred from NBCI to WCI.  ECF No. 50-30.

<b>Motion to Enter Default Judgment</b>

On June 19, 2019, this Court issued an Order directing Defendants to respond to the Complaint as amended by Fletcher within 60 days.  ECF No. 34.  The Medical Defendants filed their dispositive motion on July 24, 2019.  ECF No. 4.  On August 19, 2019, the Correctional Defendants filed a Motion for Extension of Time requesting additional time to file their response to and including September 18, 2019.  ECF No. 44.  That same day, the Court received two sets of correspondence from Fletcher stating that he had been transferred from NBCI to WCI and that, although the Court advised him that the Medical Defendants had filed a response to his Complaint, he had not received it.  ECF No. 45, 46.

On August 21, 2019, Fletcher filed a Motion to Enter Default Judgment stating that more than 60 days had elapsed since the Court's Order and Defendants failed to respond.  ECF No. 47.  On August 23, 2019, counsel for the Medical Defendants filed correspondence indicating that a copy of their dispositive motion would be sent to Fletcher at his new address.  ECF No. 48.  That same day, the Court granted the Correctional Defendants' Motion for Extension of Time, ECF No. 49, and on September 18, 2019, the Correctional Defendants filed their dispositive motion, ECF No. 50.  Based on this procedural history, both sets of Defendants timely responded to Fletcher's Complaint.  Thus, the Motion to Enter Default Judgment will be denied, and I shall proceed to address the merits of this case.

## Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the district court must view the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law," *Anderson*, 477 U.S. at 248, and a dispute of material fact is "genuine" only if sufficient evidence for the trier of fact to return a verdict for the nonmoving party. *Id.*

## Analysis

### A.     Medical Defendants

The Medical Defendants move for dismissal of the claims against them or for summary judgment in their favor. They assert that Fletcher has not alleged a serious medical need as defined by 42 U.S.C. § 1983 and, in any event, he cannot prove deliberate indifference on the part of Wexford and NP Pierce. Moreover, the Medical Defendants argue that Wexford should be dismissed pursuant to the doctrine of respondeat superior.

The claims concerning Fletcher's medical care are raised as Eighth Amendment claims. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth

Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eight Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must

have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Here, Fletcher generally states that the NBCI medical staff failed to give him adequate medical treatment and, specifically, that NP Pierce did so in retaliation after he filed ARPs against her and "her daughter R. Pierce." ECF No. 1 at 5-6. Even assuming that Fletcher's medical conditions involving dizziness, hypertension, skin rashes, a spider bite, and the need for a 2400-calorie diet were sufficiently severe that they created a serious medical need for Eighth Amendment purposes, the record does not support a finding that the Medical Defendants acted with deliberate indifference to that need.

In the months that preceded the filing of his Complaint, Fletcher was seen by NBCI medical staff regarding his complaint of feeling sick and dizzy and was twice scheduled for follow up visits for his spider bite, but he failed to report to the medical unit. After Fletcher requested a medical diet of 2,400 calories, NP Pierce approved it despite the fact that Fletcher is not insulin dependent.

19

Then, when Fletcher complained that he was "[b]eing denied high blood pressure medication," staff reviewed his chart and noted that his "meds [were] good until Nov Dec." Shortly thereafter, Fletcher underwent a physical examination, at which time medical staff noted that his vitals were unremarkable and that there were no causes for alarm. The nurse also noted that Fletcher was receiving daily doses of high blood pressure medication, and she referred him to a provider to evaluate Fletcher's complaints about his pain, while advising him to "make sure he comes for future medical calls." With regard to Fletcher's complaints about his skin rashes, the medical department provided a refill of "Tar Shampoo 255 ml." The medical staff continued to monitor Fletcher's conditions and referred him for lab work after he filed this suit, but Fletcher refused to have his blood drawn. On these facts, viewed most favorably to Fletcher, he cannot demonstrate callous disregard for a serious medical need on the part of NBCI medical staff, including NP Pierce. *See Estelle*, 429 U.S. at 105-06.

Moreover, Fletcher makes no direct allegations against Wexford. Instead, he seeks to hold Wexford liable for the actions of its alleged employees. It is well established, however, that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the

supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Here, Fletcher has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Wexford's employees. As discussed above, Fletcher failed to show that his Eighth Amendment rights were violated in connection with his medical care. Accordingly, he has necessarily failed to demonstrate that Wexford authorized or was indifferent to any such violation. Fletcher's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). Therefore, Wexford and NP Pierce are entitled to summary judgment.

## B.     Correctional Defendants

The Correctional Defendants move for dismissal of the claims against them or for summary judgment in their favor for failure to state a claim on which relief may be granted. Specifically, they assert that Fletcher's claims that he was arbitrarily transferred to NBCI; assaulted, treated unprofessionally, and retaliated against; denied access to the court and the ARP process; and subjected to violence at the hands of other inmates, all fail to demonstrate a violation of his

constitutional rights. In addition, the Correctional Defendants assert that they are entitled to qualified immunity.

<u>Transfer to NBCI</u>

It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest). Fletcher does not have a right to be housed in a particular prison, on a particular tier, or participate in a particular program. "In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns" facing inmates. *Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002) (addressing segregation of homosexual male inmates). Accordingly, to the extent Fletcher alleges that his constitutional rights were violated by being transferred from WCI to NBCI, his claim fails.

<u>Eighth Amendment</u>

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto,* 841 F.3d at 225; *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016). To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a

sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams v, Benjamin*, 77 F.3d 756, 761(4th Cir. 1996).

To satisfy the objective level of harm, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (internal quotation marks omitted). The force used here satisfies the objective requirement, but that does not end the inquiry.

The subjective element requires evidence that prison personnel used force "maliciously or sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In evaluating this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko,* 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321) (internal quotation marks omitted).

In his Complaint, Fletcher summarily states that he was subjected to excessive force in the form of sexual and physical assault. Although he was granted the opportunity to amend his Complaint, Fletcher provided no additional information regarding his claim of excessive force. Rather, he only detailed his numerous attempts to files ARPs and stated that correctional staff made derogatory remarks and placed him in administrative segregation.

Viewing the facts in the light most favorable to Fletcher, it appears that he was placed on administrative segregation only after his cellmate claimed that he had been raped by Fletcher.

Following a search of their cell during an investigation of the rape claim, a weapon was found, prompting Fletcher's transfer to punitive segregation. Within a week, however, Fletcher's adjustment hearing was held, and he was found not guilty. The undisputed evidence does not support the allegation that Correctional Staff used any force on Fletcher, let alone that such force was used maliciously or sadistically.

To the extent Fletcher alleges a constitutional violation based on the Correctional Defendants' verbal threats, his claim also fails. Verbal abuse of inmates by guards, without more, states no claim of assault. *Henslee v. Lewis*, 153 Fed. App'x 178, 180 (4th Cir. 2005); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979).

Because Fletcher does not meet his burden to identify evidence that shows that a genuine dispute of material facts exists to support a claim of cruel and unusual punishment, the Correctional Defendants are entitled to summary judgment on his excessive force claim.

Access to Courts

Where Fletcher alleges that the Correctional Defendants destroyed, delayed, or refused to accept his ARPs, the Court construes that claim as an alleged violation of due process rights under the Fourteenth Amendment. Such a claim fails because even if the Correctional Defendants did not follow the requirements of the ARP process, violations of state laws or regulations do not establish a basis for a federal procedural due process claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990) (citation omitted). Likewise, the failure to follow prison directives or regulations does not, in and of itself, establish a violation of due process. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*).

Moreover, even where a state has created internal prison procedures, the procedural protections of the Due Process Clause apply only to actions that implicate a protected liberty interest, such as those that result in the loss of good time credits, *see Ewell v. Murray*, 11 F.3d 482, 488 (4th Cir. 1993), or otherwise lengthen the amount of time an inmate must serve, *see Montanye v. Haymes*, 427 U.S. 236, 242 (1976), as well as those that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 477-78, 483-84 (1995). "[T]here is no constitutional right to participate in grievance proceedings." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (citation omitted); *see also Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). Fletcher's allegations that the Correctional Defendants hindered his access to the ARP process and failed to take appropriate investigative steps do not meet these standards.

In any event, the Correctional Defendants have provided exhibits to show that all of the ARPs properly submitted by Fletcher were received and addressed. From the record, it appears that Fletcher often attempted to submit ARPs by placing them in the mail rather than handing it to the designated Sergeant on his tier. Despite the Correctional Defendants' instructions for him to follow the proper protocol, Fletcher continued this practice. Coupled with the copious amounts of complaints he filed, his continued practice of using the institutional mail led to the delay in responding to some of his ARPs.

To the extent Fletcher alleges that he was denied access to the courts due to the correctional staff's failure to process his ARPs, his claim also fails. A critical requirement of an access-to-courts claim is that a prisoner must show "actual injury" to "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)).

Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Lewis*, 518 U.S. at 352-53 & n.3. The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Fletcher has not identified any claim that was frustrated, nor does he describe any actual injury that resulted from the loss of such a claim. Therefore, he has not satisfied the "actual injury" requirement and his access to courts claim fails.

Accordingly, the Court will grant summary judgment in favor of the Correctional Defendants on this claim.

Conspiracy

Without providing specific details, Fletcher alleges that Sgt. Wedlock conspired with the hearing officer to alter the chain of custody for the evidence presented in Fletcher's adjustment hearing. To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive plaintiff of a constitutional right, is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006-07 (4th Cir. 1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagen v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). Plaintiff must thus allege facts establishing that defendants shared a "unity of purpose or a common design" to injure him. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). "A conspiracy may . . . be 'inferred from the things actually done.'" *Murdaugh*, 639 F.2d at 1075

(quoting *Overseas Motors, Inc. v. Imported Motors Ltd., Inc.*, 375 F. Supp 499, 532 (E.D. Mich. 1974)). However, circumstantial evidence consisting of "coincidence piled on coincidence" are insufficient where the "proof of collusion is simply too attenuated" to conclude there was a conspiracy to violate the law. *Murdaugh*, 639 F.2d at 1075.

As previously noted, Fletcher provides no information to support his allegation that Sgt. Wedlock tampered with his urine specimen. Thus, he fails to present evidence to show that Sgt. Wedlock and the hearing officer acted jointly in concert or that they had an agreement to hurt him. As such, Fletcher fails to establish a civil conspiracy.

<u>Failure to Protect</u>

Fletcher claims that the Correctional Defendants failed to protect him and deliberately placed his life in danger when they refused to remove him from his cell assignment with his enemy, Daniel Collins. To establish a failure to protect claim, a prisoner must make two showings: first, that he suffered significant injury or was "'incarcerated under conditions posing a substantial risk of serious harm;'" and second, that the prison official at issue had a "'sufficiently culpable state of mind.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Under the first prong, an objective inquiry, "a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions,'" *De'Lonta*, *supra*, 330 F.3d at 634 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)), "or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *Id. De'Lonta*, 330 F.3d at 634 (citing *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)). Actual knowledge of a substantial risk does not alone impose liability. Where prison

officials respond reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

The second showing is subjective and requires proof of deliberate indifference. *See Thompson v. Virginia*, 878 F.3d 89, 107 (4th Cir. 2017). Ultimately, "'the test is whether the [prison officials] know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). To survive summary judgment, plaintiff must show facts sufficient for a reasonable factfinder to conclude that (1) he was exposed to a substantial risk of serious harm and (2) the defendants knew of and disregarded that risk. *Thompson*, 878 F.3d at 107 (citing *Farmer*, 511 U.S. at 834, 837-38) (internal quotations omitted).

Here, Fletcher fails to show that he suffered a serious or significant injury as a result of being housed with Collins. Instead, Collins was the one who reported that Fletcher had raped him. Moreover, Fletcher has not alleged facts sufficient to establish the subjective component—that the Correctional Defendants acted with a culpable state of mind. At the time Fletcher requested a transfer to another cell, on August 20, 2018, there were only three individuals listed on his Enemy List, none of whom were housed at NBCI. Although Collins was later added to that list, the change was made only as a result of Collins's filing of a PREA claim against Fletcher. Based on this record, Fletcher fails to show that they were deliberately indifferent to his health or safety. Therefore, he cannot prevail on this claim and summary judgment in favor of the Correctional Defendants is appropriate.

**C.     Unserved Defendant**

Defendant David Sipes has not been served with the Complaint.  Because Fletcher is an inmate who is proceeding *in forma pauperis*, the Court reviews the allegations against this unserved Defendant to assess whether Fletcher has stated a plausible claim for relief against him.  *See* 28 U.S.C. §§ 1915(e)(2), 1915A(b).  For the reasons discussed above relating to Sgt. Wedlock, Fletcher has also failed to allege facts to support a claim of conspiracy to tamper with evidence presented in his adjustment hearing.  *See supra* part B.  Because Fletcher has failed to state a plausible claim for relief against Sipes, the claims against him will be dismissed.  *See* 28 U.S.C. § 1915A(b).

<strong>Conclusion</strong>

Fletcher's Motion to Enter Default Judgment is denied.  The Medical Defendants' Motion to Dismiss or Alternatively, for Summary Judgment and the Correctional Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, both construed as motions for summary judgment, are granted.

A separate Order follows.


    March 2, 2020                                    /S/
Date                                          Paul W. Grimm
                                              United States District Judge